# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NCA INVESTORS LIQUIDATED TRUST,
    *Plaintiff,*

    v.

JOHN J. DIMENNA, JR, THOMAS L.
KELLY, JR., & WILLIAM A. MERRITT,
JR.,
    *Defendants.*

No. 3:16-cv-156 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

NCA Investors Liquidated Trust ("NCA Investors Trust" or "Plaintiff") has sued John J.

DiMenna, Jr., Thomas L. Kelly, Jr., and William A. Merritt, Jr., for breach of contract, or

alternatively, unjust enrichment, to recover $18,800,000 allegedly owed from defaulted loans

and related enforcement obligations. Third Am. Compl., ECF No. 133 (Oct. 12, 2017)

("Compl.").

Mr. Kelly and Mr. Merritt ("Defendants"[1]) have moved for summary judgment, and NCA

Investors Trust has objected.

For the following reasons, Defendants' motion for summary judgment is **GRANTED in**

**part and DENIED in part.**

NCA Investors Trust's breach of contract claims are dismissed, but its unjust enrichment

claim will proceed to trial, although this claim will be limited as discussed herein.

---

[1] The Court previously entered default judgment in favor of NCA Investors Trust as to Mr. DiMenna. Order on Mot. for Default Judgment, ECF No. 93 (Nov. 10, 2016).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

NCA Investors Trust is a liquidated trust established during the *In re: Newbury Common Assocs., LLC*, Case No. 15-12507 (LSS) (Bankr. D. Del.), Chapter 11 bankruptcy action. Pl.'s Local Rule 56(a)(2) Statement, ECF No. 203-1 ¶ 52 (Nov. 4, 2019) ("Pl.'s SMF"). NCA Investors Trust is the successor-in-interest to the claims of UCF 1 Trust 1 ("UFC"). *Id.* ¶ 52.

Since 1996, DiMenna, Kelly, and Merritt were the three managing members and owners of Seaboard Realty, LLC ("Seaboard Realty"), a "Stamford-based real estate company that maintained a portfolio of high-quality, distinctive commercial, residential, and hospitality properties." *Id.* ¶ 1; *id.* at Add'l Facts ¶ 1. During the relevant time period here, Mr. DiMenna owned fifty percent of Seaboard Realty, while Mr. Kelly and Mr. Merritt each owned twenty-five percent. *Id.* at ¶ 2. Seaboard Realty's Operating Agreement required "unanimous" consent by all three managing members for "business" decisions. *Id.* at Add'l Facts ¶ 11 (citing Ex. 5: Seaboard Realty Operating Agreement § 7.3).

Mr. DiMenna "managed the day-to-day operations of Seaboard Realty," and NCA Investors Trust alleges that as co-managing members, Defendants were also responsible for daily operations and "for locating investment properties and obtaining debt financing for the properties to be purchased," as well as raising capital from investors. *Id.* ¶¶ 3, 4; *cf. id.* at Add'l Facts ¶ 1 ("DiMenna had no background or experience in investment banking, venture capital, real estate finance or financial matters, generally."). But because the Seaboard Realty Operating Agreement allegedly vested sole management authority in Defendants, NCA Investors Trust alleges that the Gregory Stanton, the Chief Operating Officer of SPMI, would have provided Mr. Kelly or Mr. Merritt with any information requested by them. *See* Ex. 3: Prejudgment Remedy Hearing Tr.,

ECF No. 203-4 at 175: 9-16 (Mar. 28, 2016) ("Q. If Mr. Merritt or Mr. Kelly came up to you and said, I need a statement, you wouldn't have told them, no way, I'm not giving you that document, correct? A. Correct. Q. You would have given them what they asked for? A. Yes."); *see also* Pl's SMF at Add'l Facts ¶ 37 (alleging that Defendants "never obtained information from anyone other than DiMenna, nor did they ever independently verify the accuracy of what he told them.").

At the regular meetings of Seaboard Realty managing members, Mr. DiMenna provided Defendants "with documentation and information demonstrating that the enterprise was on sound financial footing." Pl.'s SMF ¶ 8. But NCA Investors Trust alleges that these documents "demonstrated pervasive accounting problems, construction problems, and operations deficits." *Id.* It turns out that Mr. DiMenna provided false information to Defendants. *Compare* Ex. 44, ECF No. 195-52, *with* Ex. 45, ECF No. 195-53 (two different cash balance statements – Ex. 44 allegedly located by Mr. Merritt after November 2015 and Ex. 45 being the one presented by Mr. DiMenna, which showed the entreprise in good financial health).

NCA Investors Trust alleges that Defendants, through their interests in Seaboard Realty, personally guaranteed $18.8 million in loans for two separate projects: a $15,300,000 mezzanine loan to Park Square West Member Associates, LLC ("PSW Guarantee") and a $3,500,000 mezzanine loan to Seaboard Hotel Member Associates, LLC ("Courtyard Guarantee"). *Id.* ¶¶ 19-23, 27, 31-33.

### 1.     Corporate Entities

The Seaboard Property Management, Inc. ("SPM"), a company solely owned and controlled by Mr. DiMenna, managed the Seaboard Realty properties. *Id.* ¶ 5. In exchange for four percent of the total monthly gross receipts and five percent of the net commercial rentals,

"SPM's responsibilities included collecting rent, marketing and leasing space, paying operating expenses, filing tax returns, procuring insurance, providing for maintenance, repairs, and alterations, contracting with service providers, and purchasing all goods and materials utilized in the operation of the business." *Id.* ¶ 6.

Seaboard Realty created Park Square West Member Associates, LLC ("PSWMA") and Park Square West Associates, LLC ("PSWA") to effectuate the purchase of the Park Square West Apartments, located at Summer Street in Stamford, Connecticut ("PSW Property"). *Id.* ¶ 13. PSWA took title to the PSW Property. *Id.* PSWMA was the sole member, and thus owned 100%, of PSWA. *Id.* Seaboard Realty was the managing member and owned a twenty-five percent interest in PSWMA, while fifty individual investors owned the remaining seventy-five percent interest. *Id.*

Seaboard Realty created Seaboard Hotel Member Associates, LLC ("SHMA") and Seaboard Hotel Associates, LLC ("SHA") to effectuate the purchase of the Courtyard by Marriott Hotel, located on Summer Street in Stamford, Connecticut ("Courtyard Hotel"). *Id.* ¶¶ 19, 20. SHA took title to the Courtyard Hotel. *Id.* ¶ 20. SHMA was the sole member, and thus owned 100%, of SHA. *Id.* Seaboard Realty was the managing member and owned a twenty-five percent interest in SHMA, while over fifty individual investors owned the remaining seventy-five percent interest. *Id.*

### 2.    Park Square West Loan

In early 2011, Seaboard Realty contracted to purchase the PSW Property. *Id.* ¶ 11. Mr. DiMenna advised Defendants "that the purchase would be accomplished by assuming a $22 million mortgage held by the Connecticut Housing Finance Authority ('CHFA') and raising the remaining amount from individual investors." *Id.* ¶ 12.

On December 28, 2011, Mr. DiMenna executed a promissory note on behalf of PSWMA for $8 million in favor of Titan Capital ID, LLC ("Titan") ("Titan Loan"). Ex. 10: Promissory Note to Titan Capital ID, LLC, ECF No. 195-18 (Dec. 28, 2011). Defendants allege Mr. DiMenna did so without their knowledge, consent, or authority. Local Rule 56(a)(1) Statement of Undisputed Facts in Support of Mot. for Summ. Judgment, ECF No. 195-2 ¶ 15 (Sept. 6, 2019) ("Defs.' SMF"). As a condition of the Titan Loan, "Titan required that Seaboard Realty provide it with a written consent certifying that it was the sole member and manager of PSWMA (which was false); that so long as the Titan Loan was outstanding, DiMenna was to be the sole managing member of Seaboard Realty (which was false); and that Kelly and Merritt were to resign as managing members of Seaboard Realty (which was false)." Pl.'s SMF ¶ 16.

Mr. DiMenna not only forged the signatures of Mr. Kelly and Mr. Merritt for the written consent, but neither of them "were aware of the written consent, and did not sign, authorize, or consent it." *Id.* ¶ 17. Although attached to the written consent were forms in which Defendants purportedly resigned as managing members of Seaboard Realty, neither "intended to resign, nor did they sign, authorize, consent to, or even know about the resignation." *Id.* ¶ 18. Nevertheless, NCA Investors Trust alleges that because Defendants knew of the PSW Property purchase, "they are charged with constructive knowledge of the facts underlying that purchase." *Id.* ¶¶ 17, 18; *see also id.* at Add'l Facts ¶ 25 (alleging that "[e]ven though the [PSW Property purchase] was the largest acquisition undertaken by Seaboard Realty, neither Kelly nor Merritt had any meaningful involvement in the deal").

On or about November 1, 2012, PSWMA executed a Mezzanine Promissory Note for $12 million ("the PSW Loan") in favor of UCF. *Id.* ¶ 21. The PSW Loan was executed by Mr. DiMenna on behalf of PSWMA, and guaranteed by both Mr. DiMenna and an unauthorized

entity established by Mr. DiMenna called PSWMA I, LLC ("PSWMA I"). *Id.* ¶ 22. Although PSWMA I was purported to be the sole member of PSWMA, it actually held no interest in that entity. *Id.*

On November 2, 2012, UCF funded the PSW Loan. *Id.* ¶ 23. Defendants allege they "did not know about, consent to, or authorize the PSW Loan or any of the documents concerning it and were completely unaware of it." Defs.' SMF ¶ 24. NCA Investors Trust alleges Defendants had constructive knowledge of the PSW Loan because they "had access to all of the documents and information related to the PSW Loan, but chose to abdicate their management responsibilities." Pl.'s SMF ¶ 24 (citing Ex. 16: 12/30/2011 PSW Closing Statement, ECF No. 203-4; Ex. 35: 2012 O'Connor Davies Audit, ECF No. 203-4; Ex. 36: 2013 O'Connor Davies Audit, ECF No. 203-4; Ex. 38: 2012-2015 PSW Borrower Form 1065).

As part of the PSW Loan, UCF required that Mr. DiMenna be the sole managing member of Seaboard Realty, and that Defendants "were to have no role managing Seaboard Realty and its various properties." *Id.* ¶ 25. Mr. DiMenna provided UCF with both the forged written consent from the Titan Loan and the forged resignations of Defendants he prepared in connection thereof. *Id.* ¶ 26. Additionally, UCF's consent was required with "any action or attempted action to remove, replace, or substitute DiMenna as the managing member of Seaboard Realty." *Id.*

PSWMA made monthly interest-only payments on the PSW Loan through June 2015. *Id.* ¶¶ 30, 73.

### 3. Courtyard Loan

In April 2011, Seaboard Realty contracted to purchase a ground lease to operate the Courtyard Hotel for approximately $30 million. *Id.* ¶ 19; *id.* at Add'l Facts ¶ 32.

On November 30, 2012, SHMA executed a Mezzanine Promissory Note for $3.5 million

in favor of UCF ("Courtyard Loan"). *Id.* ¶ 27. The Courtyard Loan was executed by Mr. DiMenna on behalf of SHMA, and personally guaranteed by Mr. DiMenna and allegedly also guaranteed by Seaboard Hotel LTS Member Associates, LLC ("LTSMA"). *Id.* ¶ 28. LTSMA was an entity created to own 100% of the interest in Seaboard Hotel LTS Associates, LLC ("LTSA"), which was purchasing a property in Stamford to construct a Residence Inn by Marriott hotel. *Id.*

Defendants allege they "did not know about, consent to, or authorize the Courtyard Loan or any of the documents concerning it." Defs.' SMF ¶ 29. NCA Investors Trust alleges Defendants had constructive knowledge of the Courtyard Loan, because they "had access to all of the documents and information related to the Courtyard Loan, but chose to abdicate their management responsibilities." Pl.'s SMF ¶ 29 (citing various documents, Exs. 39-42).

SHMA made monthly interest-only payments on the Courtyard Loan through July 2015. *Id.* ¶¶ 30, 74.

### 4. St. John's Towers

In 2012, Mr. DiMenna formed Stamford Residential Associates, LLC ("SRA") to purchase a mixed-use real estate property known as the St. John's Towers, located in Stamford, Connecticut. *Id.* ¶ 42. Stamford Residential Member Associates, LLC ("SRMA") owned SRA. *Id.* Neither Defendants nor Seaboard Realty had any involvement in the St. John's Tower project. *Id.* ¶ 43.

In February 2013, a few months after the initial PSW and Courtyard Loans were made by UCF, Daniel Palmier invested $300,000 in SRMA. *Id.* ¶ 44. Daniel Palmier is the CEO of UCF. *Id.* ¶ 41.

SRA ultimately did not purchase the St. John's Towers and had no income. *Id.* ¶ 46.

### 5.      Upsize Loan and Further Conditions

On March 25, 2014, PSWMA executed an Amended and Restated Mezzanine Promissory Note in favor of UCF and increased the PSW Loan from $12 million to $15.3 million ("Upsize Loan"). *Id.* ¶ 31. UCF required several conditions for the Upsize Loan.

First, UCF required Mr. DiMenna and Defendants to enter into a brokerage agreement whereby a UCF affiliate, CPR Capital Funding, LLC ("CPRCF"), "received the exclusive right to place permanent debt and mezzanine or preferred equity financing" on several Seaboard Realty properties, including the PSW Property and the Courtyard Hotel, as well as on the St. John's Towers, which was not a Seaboard Realty property, nor did Defendants have any interest in the St. John's Towers. *Id.* ¶ 32; *see also id.* ¶¶ 43, 44.

Second, UCF required Defendants' personal guarantees on the principals of the PSW Loan, the Courtyard Loan, and the Upsize Loan, for a total of $18.8 million (the "Upsize Guarantees"). *Id.* ¶ 33.

Third, UCF required that PSWMA obtain a "Legal Opinion Regarding (a) authority of all entities to enter into amendment/additional documents; (b) enforceability of all amendment/additional documents," which included the Upsize Guarantees. *Id.* ¶¶ 34, 35 (with ¶ 34 citing Ex. 25: Post-Closing and Further Assurance Agreement, 195-33 (Mar. 25, 2014)).

Defendants allege they did not sign the Upsize Guarantees, and "they did not authorize, consent, or even know about the Upsize Loan or the Upsize Guarantees." Defs.' SMF ¶ 36. NCA Investors Trust concedes that Mr. DiMenna forged Defendants' names to the Upsize Guarantees, but nevertheless allege that Defendants ratified the Upsize Guarantees. Pl.'s SMF ¶ 36. Furthermore, NCA Investors Trust does not dispute Mr. DiMenna's admission to the forgery, i.e. placing the signatures of Defendants on the Upsize Guarantees without their knowledge, consent,

or authorization. *Id.* ¶ 38. The forgeries on the Upsize Guarantees were confirmed by Defendants' forensic document expert, Peter Tytell. *Id.* ¶ 40.

UCF never contacted Defendants before the purported execution of the Upsize Guarantees. *Id.* ¶ 37.

Finally, as another condition, UCF required that Palmier's $300,000 investment in SRMA be repaid, with interest, out of the Upsize Loan proceeds. *Id.* ¶ 45. Palmier thus received $365,000, which represented a nearly twenty-two percent return on his investment. *Id.*

PSWMA made interest-only payments on the Upsize Loan through June 2015. *Id.* ¶ 75.

### 6.    Fraud Discovery and Bankruptcy Action

In early November 2015, Mr. Merritt received a letter from a bank that had a mortgage on a Seaboard Realty property. *Id.* ¶ 47. The letter stated that the mortgage was in default. *Id.* Mr. Merritt alleges he was unaware this particular bank had a mortgage on the property, *id.* ¶ 48, but NCA Investors Trust alleges that the "mortgage was a matter of public record and identified in the books and records of Seaboard Entities," *id.* ¶ 48.

After receiving the bank's default letter, Mr. Merritt "reviewed the land records at the Stamford Town Clerk's Office, where he discovered that Mr. DiMenna had taken out loans on the various properties in the enterprise without the knowledge, consent, or authorization of his partners." *Id.* ¶ 49 (disputing to the extent that NCA Investors Trust maintains Defendants had constructive knowledge of said information).

Defendants then confronted Mr. DiMenna, who "confessed to his fraudulent activities, and was removed of his duties with Seaboard Realty." *Id.* ¶ 50. Defendants first saw the Upsize Guarantees, after they discovered Mr. DiMenna's fraud. *Id.* ¶ 54 (denied to the extent that NCA Investors Trust maintains Defendants were on inquiry notice and had constructive knowledge);

*but see id.* ¶ 55 (admitting that "[t]here are no references to the PSW Loan, the Courtyard Loan, the Upsize Loan, or the Upsize Guarantees in the meeting minutes of Seaboard Realty"). At the meetings of Seaboard Realty over the years, Mr. DiMenna provided Defendants with documents showing the mortgages on the properties, but "none of these documents showed the mezzanine loans issued by UCF." *Id.* ¶ 56. Furthermore, "[t]here are no references to the UCF Loans in the thousands of pages of e-mails exchanged between DiMenna, Merritt, and Kelly." *Id.* ¶ 57.

In December 2015, Seaboard Realty and its affiliated entities declared bankruptcy. *Id.* ¶¶ 51-53; *see also In re: Newbury Common Assocs., LLC*, Case No. 15-12507 (LSS) (Bankr. D. Del.) ("Bankruptcy Case"). The Bankruptcy Court approved the Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Propco and Holdco Debtors (with Technical Modifications) (the "Joint Plan"), which resolved the Bankruptcy Case. Pl.'s SMF ¶ 52. As part of the the Joint Plan, NCA Investors Trust was created to pursue certain causes of action known as the Investor Trust Causes of Action, which include the claims in this lawsuit. *Id.*

As part of the Bankruptcy Case, UCF and several other lenders settled their claims. *Id.* ¶ 53. UCF and its affiliates received $6,871,000, gave up its creditors' claim in the Bankruptcy Court, and transferred its rights in this lawsuit to NCA Investors Trust. *Id.*

### 7. Investments and Distributions

Mr. Kelly and Mr. Merritt both made various investments in SHMA and PSWMA, and received distributions based on their interests in the respective entities. Defs.' SMF ¶¶ 58-66. Prior to March 2014, Mr. Kelly transferred his rights in Seaboard Realty's distributions to TLK Partners, LLC ("TLK Partners"), a company operated by Mr. Kelly and his son. Pl.'s SMF ¶ 68. Mr. Kelly was also a limited member of TLK Seaboard Investments, LLC ("TLKSI"), where the majority interest was a trust set up to benefit Mr. Kelly's wife. Defs.' SMF ¶ 61.

Investments allegedly attributable to Mr. Kelly are: (1) $500,000 in SHMA from Mr. Kelly's individual retirement account ("IRA") with the PENSCO Trust Company, *id.* ¶ 58; and (2) $1 million in PSWMA from TLKSI, of which Mr. Kelly was entitled to 0.24% of distributions, *id.* ¶ 61. Distributions allegedly attributable to Mr. Kelly are: (1) $75,000 from SHMA based on his IRA interest and a quarterly distribution of $9,375 (except for a double distribution in the third quarter of 2015), *id.* ¶¶ 59, 60; and (2) $360 from PSWMA based on TLKSI's interest, *id.* ¶ 62.

Investments allegedly attributable to Mr. Merritt are: (1) $150,000 in SHMA, *id.* ¶ 65; and (2) $9,229 in PSWMA, *id.* ¶ 63. Distributions allegedly attributable to Mr. Merritt are: (1) $22,504 from SHMA based on a quarterly distribution of $2,813, *id.* ¶ 66; and (2) $1,384 from PSWMA based on a quarterly distribution of $173 (except for a double distribution in the third quarter of 2015), *id.* ¶ 64.

Defendants allege they received distributions based on each entity's operating agreements. *Id.* ¶¶ 59, 67. After the Upsize Loan, Mr. Kelly alleges he received $108,438.48 in distributions attributable to PSWMA and $103,658.96 in distributions attributable to SHMA. *Id.* ¶ 70. After the Upsize Loan, Mr. Merritt alleges he received $180,730.80 in distributions attributable to PSWMA and $103,658.96 in distributions attributable to SHMA. *Id.* ¶ 71. These post-Upsize Loan distribution numbers are based on Seaboard Realty's twenty-five percent interests in both PSWMA and SHMA, and each Defendants' individual twenty-five percent interest in Seaboard Realty. Pl.'s SMF ¶¶ 2, 13, 20.

Defendants allege their investments in PSWMA and SHMA were lost when the entities filed for bankruptcy. Defs.' SMF ¶ 72.

### B. Procedural History

Familiarity with the procedural history is assumed. *See* Ruling on Pending Mots., ECF No. 66 (June 29, 2016); Ruling and Order on Mot. to Dismiss or for Sanctions, ECF No. 191 (June 27, 2019) ("Sanctions Order").

On June 27, 2019, the Court issued a ruling and order on various motions, including granting Defendants' motion for sanctions related to NCA Investors Trust's failures to properly preserve Seaboard Realty paper and electronic records, as it was required to do under the Bankruptcy Case's Joint Plan. Sanctions Order, ECF No. 191 at 10-16. The Court allowed Defendants to file a motion for attorney's fees and costs, and denied without prejudice to renewal after the close of discovery or at trial Defendants' request to seek an adverse jury instruction or dismissal of the case. *Id.* at 23.

On September 6, 2019, Defendants moved for summary judgment, arguing (1) the breach of contract claims fail because there is no evidence Defendants knew about the UCF loans, so they could not have ratified them, and (2) the unjust enrichment claim fails because Defendants invested their time and money in the projects from which they received distributions, and UCF (and thus NCA Investors Trust as the successor-in-interest) also had unclean hands. Mot. for Summ. Judgment, ECF No. 195 (Sept. 6, 2019). Along with a memorandum of law, they also filed a statement of material facts, several affidavits, and forty-nine exhibits. *See* Mem. in Support of Mot. for Summ. Judgment, ECF No. 195-1 (Sept. 6, 2019) ("Defs.' Mem."); Local Rule 56(a)(1) Statement of Undisputed Facts in Support of Mot. for Summ. Judgment, ECF No. 195-2 (Sept. 6, 2019) ("Defs.' SMF"); *see also* Docket Entries, ECF Nos. 195-3—195-57 (Sept. 6, 2019).

On November 4, 2019, NCA Investors Trust timely opposed Defendants' motion for

summary judgment. Pl.'s Mem. of Law in Opp. to Mot. for Summ. Judgment, ECF No. 203 (Nov. 4, 2019) ("Pl.'s Opp."); Pl.'s Local Rule 56(a)(2) Statement, ECF No. 203-1 (Nov. 4, 2019) ("Pl.'s SMF"); *see* Docket Entries, ECF Nos. 203 – 203-4 (affidavits and fifty-seven exhibits).

On November 26, 2019, Defendants timely replied. Defs.' Reply to Pl.'s Opp., ECF No. 203 (Nov. 26, 2019) ("Defs.' Reply").

On December 18, 2019, the Court held a hearing on the motion for summary judgment. Minute Entry, ECF No. 211 (Dec. 18, 2019).

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250. If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving

party for the issue on which summary judgment is sought, then summary judgment is improper.

*See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.   DISCUSSION

### A.   Breach of Contract Claim

 "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). "The law concerning when a breach of contract action accrues is well settled… '[T]he cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted.'" *Tolbert v. Connecticut Gen. Life Ins. Co.*, 257 Conn. 118, 124 (2001) (quoting *Kennedy v. Johns-Manville Sales Corp.*, 135 Conn. 176, 180 (1948)).

Connecticut's Statute of Frauds further provides:

No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (2) against any person upon any special promise to answer for the debt, default or miscarriage of another . . .

Conn. Gen. Stat. § 52-550(a).

NCA Investors Trust alleges two counts of breach of contract based on the Upsize Guarantees, which were Defendants' purported personal guarantees on the principals of the PSW Loan, the Courtyard Loan, and the Upsize Loan, for a total of $18.8 million. Compl. ¶¶ 35-46. Defendants argue these claims must fail for two reasons: (1) the claims violate Connecticut's Statute of Frauds, Defs.' Mem. at 13-15; and (2) Defendants never ratified the Upsize Guarantees, *id.* at 15-18.

Because NCA Investors Trust concedes that Defendants did not sign the Upsize Guarantees due to Mr. DiMenna's admitted and verified forgeries, *see, e.g.*, Pl.'s SMF ¶¶ 38-40,

NCA Investors Trust argues that Defendants nonetheless impliedly ratified the Upsize Guarantees.

"As a general rule, ratification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances." *Cmty. Collaborative of Bridgeport, Inc. v. Ganim*, 241 Conn. 546, 560-61 (1997) (quotation marks and citation omitted). At the same time, "silence, as well as affirmative acts, may imply an intent to ratify." *Id.* at 561-62 (quotation marks and citation omitted). Implied ratification is "sometimes put upon the ground that ratification of the unauthorized act is presumed from failure to disaffirm." *Cohen v. Holloways', Inc.*, 158 Conn. 395, 408 (1969).

Defendants argue that there is no evidence they ever knew about the PSW Loan, the Courtyard Loan, the Upsize Loan, or the Upsize Guarantees until after they discovered Mr. DiMenna's fraud. Defs.' Mem. at 15. Consequently, because there is no evidence of actual knowledge, Defendants contend that NCA Investors Trust can only win if they succeed on a theory of constructive knowledge and implied ratification, which is untenable because Connecticut law requires actual knowledge for ratification. *Id.*

As it has done continuously in this litigation, NCA Investors Trust urges the Court to recognize that Defendants' failure to discover Mr. DiMenna's allegedly fraudulent acts earlier constitutes ratification in this case. Pl.'s Opp. at 17-28. NCA Investors Trust contends that under Connecticut law, "full and adequate means of knowledge are equivalent to knowledge itself." *Id.* at 20 (citing *Post v. Clark*, 35 Conn. 339, 342 (1888), and *Myers v. Burke*, 120 Conn. 69, 75 (1935)).

According to NCA Investors Trust, Defendants had "constructive knowledge" of Mr.

DiMenna's fraudulent acts because they had "'full and adequate means' to obtain knowledge of

the material facts concerning the UCF Loans," *id.* at 20, and ultimately failed to conduct the type

of financial due diligence allegedly required by their fiduciary duties. *Id.* at 20-28. NCA

Investors Trust also cites to a Connecticut statute that apparently recognizes that a forged

instrument may be ratified by implication. *Id.* at 18 (citing Conn. Gen. Stat. §§ 42a-3-403(a), 3-

406(a), which concerns the ratification of forged signatures on negotiable instruments).

In reply, Defendants first emphasize Mr. DiMenna's admitted fraud and his guilty plea to

"provid[ing] his business partners with false sales contracts, false lease commitments and other

false documents concerning the status and prospect of the various real estate investments.

DIMENNA also began to enter into financing agreements without the knowledge, consent or

authorization of his two business partners." Defs.' Reply at 3 (citing Ex. D: *United States v.*

*DiMenna*, No. 3:17-cr-202 (VAB), Information, ECF No. 1 ¶ 12 (Sept. 11, 2017)). Defendants

then reiterate that Connecticut law is clear on not recognizing constructive ratification, because

"[r]atification requires acceptance of the results of the act with an intent to ratify, and with full

knowledge of all the material circumstances." *Id.* (citing *Cmty. Collaborative of Bridgeport*, 241

Conn. at 560). Because NCA Investors Trust "cannot and has not provided evidence that Merritt

and Kelly knew of or intended to ratify the UCF Loans or the forged Upsize Guarantees,"

Defendants argue that there is "no dispute that Merritt and Kelly never knew about, consented to,

or authorized the UCF Loans or that they learned of and acquiesced to the forged Upsize

Guarantees." *Id.* at 4.

The Court agrees.

As this Court previously held, "[t]here is insufficient support in Connecticut law on ratification . . . to support the application of the constructive knowledge principle here." Ruling on Pending Mots., ECF No. 66 at 7.

The Connecticut Supreme Court has made clear that "[i]ntention is an essential element in the doctrine of ratification." *Cmty. Collaborative of Bridgeport*, 241 Conn. at 563 n.8. NCA Investors Trust could not earlier adduce any evidence as to the intention of Defendants to ratify the loans at issue, *see, e.g.*, Ruling on Pending Mots., ECF No. 66 at 5-8, and NCA Investors Trust has not done so now at the motion for summary judgment stage. Instead, Plaintiff relies again on the silent acceptance of the profits Defendants Kelly and Merritt received as a result of Mr. DiMenna's actions to imply their intent to ratify the loans and guarantees. *See Cmty. Collaborative of Bridgeport*, 241 Conn. at 561-62 ("silence, as well as affirmative acts, may imply an intent to ratify"); *Cohen v. Holloways', Inc.*, 158 Conn. 395, 408 (1969) ("sometimes . . . ratification of the unauthorized act is presumed from failure to disaffirm"). As this Court previously held, however, a finding of intent on this basis generally requires "a full and complete knowledge of all the material facts connected with the transaction to which it relates." *Cohen*, 158 Conn. at 408.

Here, Defendants did not have actual knowledge of the loans and guarantees at issue, and NCA Investors concedes this. *See, e.g.*, Pl.'s SMF ¶ 29 ("Kelly and Merritt are charged with constructive knowledge."); *see also id.* ¶ 36 ("admitted that DiMenna forged Kelly's and Merrit's names to the Upsize Guarantees"); *id.* ¶¶ 38-40 (more admissions regarding DiMenna's forgeries[2] of Kelly and Merritt's signatures). Under NCA Investors Trust's reading of the law,

---

[2] NCA Investors Trust also mentions Conn. Gen. Stat. §§ 42a-3-403(a), 3-406(a), but that statute is inapplicable here to forged signatures on guarantees, because it only addresses negotiable instruments, e.g. checks. *See* Conn. Gen. Stat. § 42a-3-104 (defining types of negotiable instruments).

because "[a]ccurate books and records always existed," Defendants should have uncovered Mr. DiMenna's fraudulent schemes before the fraud had taken hold or before too much of UCF's money had been expended. Pl.'s Opp. at 27. Nevertheless, that assertion does not overcome the undisputed facts of Mr. DiMenna's various fraudulent acts, his forgeries of Defendants' names and signatures, and the maintenance of two sets of financial records (one of which was fictional). *See, e.g.*, Pl.'s SMF ¶ 55 ("There are no references to the PSW Loan, the Courtyard Loan, the Upsize Loan, or the Upsize Guarantees in the meeting minutes of Seaboard Realty.").

Because neither Mr. Kelly nor Mr. Merritt had "full and complete knowledge" of Mr. DiMenna's various fraudulent financial transactions, the breach of contract claims must fail.

Accordingly, the Court will grant summary judgment on these two counts.

### B.    Unjust Enrichment Claim

Unjust enrichment is "a broad and flexible remedy," "[w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006). In order to recover for unjust enrichment, a plaintiff "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Id.*

"A claim for unjust enrichment is an equitable claim. In matters of equity, the court is one of conscience which should be ever diligent to grant relief against inequitable conduct, however ingenious or unique the form may be." *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 291 Conn. 433, 459 (2009). In analyzing a claim of unjust enrichment, the Court must "examine the circumstances and the conduct of the parties" and determine "what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable."

*Id.* at 451 (internal citations and quotations omitted); *see also Greenwich Contracting Co., Inc. v. Bonwit Constr. Co., Inc.,*, 156 Conn. 123, 130 (1968) ("[T]he word 'unjustly' as used in the equitable maxim that one shall not be allowed unjustly to enrich himself at another's expense means unlawfully.").

"'Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit.'" *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 25 (2019) (quoting *Town of New Hartford*, 291 Conn. at 468). The standard for alleging a defendant's indirect benefit is "highly restrictive," and "the plaintiff must prove that it has 'a better legal or equitable right' to the disputed benefit than the defendant." *Id.* (quoting 2 Restatement (Third), Restitution and Unjust Enrichment § 48 at 144 (2011)). "The plaintiff must prove that its right is both recognized, and accorded priority over the interest of the defendant, under the law of the jurisdiction." *Id.* (internal citations and quotations omitted).

Defendants submit that "the distributions received by Merritt and Kelly were in consideration of their investments of money and time and certainly could not be considered unlawful." Defs.' Mem. at 23. Defendants contend that over the years in their roles as managing members of Seaboard Realty, they performed extensive services in efforts to make the enterprise successful. *Id.* at 25. Not only are "they are entitled to be compensated for their work," Defendants also "made direct investments for which they are entitled to receive distributions as per the respective entities' operating agreements." *Id.*

According to Defendants, Plaintiff cannot establish it has "a better legal or equitable right" to the funds than Defendants, nor has Plaintiff established that its "interest should be

accorded priority" over Defendants' legitimate interests. *Id.* at 26 (citing *Geriatrics*, 332 Conn. at 26-27). Even if the Court finds that Plaintiff has an unjust enrichment claim, Defendants urge the Court to only consider the two distributions made after payments to the UCF Loans stopped (from the third and fourth quarters of 2015) instead of all distributions made after the Upsize Loan was made, as Plaintiff requests. *Id.*

In response, NCA Investors Trust first asserts that "[t]here is no requirement to trace funds from UCF to Kelly and Merritt. It is enough that Kelly and Merritt received the benefits from the UCF Loans." Pl.'s Opp. at 29. According to Plaintiff, Defendants benefitted from the UCF Loans because they allowed Mr. DiMenna's fraud to continue, which allowed Defendants to continue receiving significant sums of money from the Seaboard Entities. *Id.* Specifically, Defendants allegedly received the benefit of both (1) the beneficial interest they held in the real estate that was acquired, and (2) the distributions through SHMA, PSWMA, and Seaboard Realty. *Id.* at 30. NCA Investors Trust contends that "no post-2012 distributions from Seaboard realty (or otherwise) would have been made to Kelly or Merritt had they looked at the information available to them." *Id.* at 31 (positing that Defendants and their designees received $1,394,729 in distributions between 2012 and 2015).

Second, NCA Investors Trust asserts that creditors such as UCF (and thus, NCA Investors Trust) "always have priority over equity holders concerning payment rights," so nothing should have been paid to any equity holders of SHMA or PSWMA until the UCF Loans were paid in full. *Id.* at 32 (citing Conn. Gen. Stat. § 34-267f for the proposition that "creditors of a limited liability company have priority over membership interest holders;" § 34-255d for the proposition that "insolvent LLC cannot make distributions;" and § 34-255(e) for the proposition that "recipient of distribution from an insolvent LLC [is] personally liable to return amount

distributed"). As NCA Investors Trust views the law, UCF had priority to payment on its loans, and so Plaintiff now has that superior right to payment. *Id.* at 33.

Third, NCA Investors Trust contends that not only did Defendants not perform any valuable services for Seaboard Realty because their management deficiencies were substantial, *id.* at 34, but the relevant operating agreements allegedly provide that "the Manager [Seaboard Realty] shall receive no compensation from the Company for its management of the Company's business," *id.* at 33 (citing the different borrower operating agreements). As a result, they argue that the Defendants "had no legal entitlement to compensation as managers of" PSWMA or SHMA. *Id.* at 33-34.

In reply, Defendants dispute the relevance of the statutes cited by Plaintiff because PSWMA and SHMA were insolvent at the time distributions were made to Defendants, and thus no funds should have been distributed. Defs.' Reply at 5. Defendants note that Conn. Gen. Stat. §§ 34-267f, 34-255d, and 34-255e were not in effect when the relevant companies were operating, because these statutes did not become law until July 1, 2017, over a year after the entities declared bankruptcy. *Id.* Although § 34-267f is similar to former § 34-210, Defendants argue that both apply only in the event of the winding up of a limited liability company, and neither PSWMA nor SHMA were being wound up between 2012 to 2015. *Id.* In addition, Defendants point to § 34-161 and § 34-210, which were in effect during the relevant time period and provided that when a member becomes entitled to a distribution, he becomes a creditor on equal footing with other creditors of the limited liability company. *Id.*

The Court agrees in part.

As this Court previously stated, "[t]he essence of UCF's unjust enrichment claim is that it relied on the personal guarantees of Defendants Merritt and Kelly in entering into the PSW Loan

Modification to UCF's detriment and these loan obligations have not been paid in accordance with their terms." Ruling on Pending Mots., ECF No. 66, at 8. As UCF's successor-in-interest, NCA Investors Trust now assumes the same posture.

Here, Defendants had an interest in the distributions under the operating agreements of the various Seaboard entities. *See* Ex. 35: SHMA Operating Agreement, ECF No. 195-43 at § 11 (setting forth allocations and distribution); Ex. 38: PSWMA Operating Agreement, ECF No. 195-46 at § 11 (same). And it was not "unlawful" for them to receive distributions from entities in which they invested both money (through their direct investments) and time (through their service as managing members of Seaboard Realty, regardless of the quality of that management). *See Greenwich Contracting*, 156 Conn. at 130 ("[T]he word 'unjustly' . . . means unlawfully.").

Of course, UCF (and thus NCA Investors Trust) had an interest in the loans being repaid. The issue then is whether a genuine dispute of material fact exists as to whether Plaintiff's interest should be accorded priority over Defendants' interests.

NCA Investors Trust, however, relies on statutes, Conn. Gen. Stat. §§ 34-267f, 34-255d, and 34-255e, that only came into effect on July 1, 2017, more than three years after the Upsize Guarantees, the basis for the unjust enrichment claim, were executed on March 25, 2014. *See* Pl.'s SMF ¶ 31. In addition, the previous iteration of § 34-210 (similar to § 34-267f) only applies to the "winding up" of limited liability companies, and the various entities were not being wound up at the time frames in question. *See* Pl.'s SMF ¶ 51 ("In December 2015, the affiliated entities of Seaboard Realty declared bankruptcy."). As a result, none of these statutes provide a basis for NCA Investors Trust's unjust enrichment claim.

While Conn. Gen. Stat. § 34-161 and § 34-210 existed when the Upsize Guarantees were executed, these statutes merely put Defendants' interests as member-creditors on the same

footing as other creditors. *See* § 34-161 ("At the time a member becomes entitled to receive a distribution, the member has the status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution."); § 34-210 (providing for distribution of assets upon winding up of a limited liability company first to "members who are creditors").

In any event, NCA Investors Trust's unjust enrichment claim suffers from a more fatal flaw: the failure to demonstrate more specifically how Merritt and Kelly were unjustly enriched. NCA Investors argues that "[t]here is no requirement to trace funds from UCF to Kelly and Merritt. It is enough that Kelly and Merritt received the benefits from the UCF Loans," Pl.'s Opp. at 29.

The Court disagrees.

As the Connecticut Supreme Court recognized in *Town of New Hartford*, "restitution, which is a remedy for unjust enrichment . . . ,'is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep.'" 291 Conn. at 460 (quoting D. Dobbs, Remedies (1973), § 4.1, p. 224). Indeed, "the money recovery called damages is based upon the plaintiff's loss, and in that respect stands in bold contrast to the money recovery called restitution, which is based upon the defendant's gain." *Id.* at 460-61 (citation and quotation omitted). In *Town of New Hartford*, the Connecticut Supreme Court also distinguished between an award "consistent with the compensatory nature of a damages award," and the amount "intended only to disgorge from the defendant the amount by which it had been unjustly enriched and not to compensate the plaintiffs fully for their losses." *Id.* at 461.

As a result, even if NCA Investors Trust cannot "trace funds from UCF to Kelly and Merritt" precisely, Pl.'s Opp. at 29, NCA Investors Trust must still "lay a foundation that will

enable the trier [of fact] to make a fair and reasonable estimate." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 285 (1994) (citation and quotation marks omitted). In *Hartford Whalers*, the Connecticut Supreme Court affirmed that the trial court had sufficient evidence to determine a remedy for unjust enrichment for advertising and merchandising services because "based upon a contract price on the same order as the price that they had paid the previous year for a less extensive advertising program, and based upon the same price that Brass City, which the defendants had designated to sign the contract for the year in question, had agreed to pay." *Id.* at 286; *see also Walpole Woodworkers, Inc. v. Manning*, 307 Conn. 582, 591 (2012) ("A trial court does not abuse its discretion by calculating the benefit to a defendant based upon a freely negotiated contract price.").

NCA Investors Trust, however, have not laid down the necessary foundation. Given the vast amounts of underlying financial documentation and the various corporate entities involved here in this record, the finder of fact could not reasonably determine how much of the money Kelly and Merritt allegedly earned from these various entities instead rightfully belonged to NCA Investors. Based on this record, rather than seek to disgorge from Kelly and Merritt the amount the two have been unjustly enriched by Mr. DiMenna's fraud, NCA Investors Trust instead seeks to be compensated fully for their own losses. At this stage of the case, however, NCA Investors Trust "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson*, 781 F.3d at 44 (citation omitted).

Indeed, as Defendants have argued, an unjust enrichment claim could not arise until the underlying loans were in default. NCA Investors Trust, in fact, received the monthly payments from PSWMA on the PSW and Upsize Loans until June 2015, Pl.'s SMF *id.* ¶¶ 30, 73, 75, and SHMA made monthly payments to the Courtyard Loan until July 2015, *id* ¶¶ 30, 74. As a result,

a reasonable factfinder could not conclude that a basis for unjust enrichment existed for any distributions made to Merritt and Kelly, i.e., "benefits that it would be unjust for [them] to keep," *Town of New Hartford*, 291 Conn. at 460 (citation and internal quotation omitted), for any distributions made to them before June 2015 for the PSW and Upsize Loans and before July 2015 with respect to the Courtyard Loan.

Of course, after the bankruptcy filing of Seaboard Realty and its related entities on December 13, 2015, neither Merritt nor Kelly received distributions that "would be unjust for [them] to keep." *See* Compl. ¶ 28 (setting forth the date of bankruptcy); Pl.'s SMF ¶¶ 51-53 (referencing the Bankruptcy Case in Delaware). Thus, to the extent that there is a genuine dispute of material fact as to NCA Investors Trust's unjust enrichment claim, it is whether NCA Investors Trust has a right to claim any part of the distributions made to Merritt and Kelly between June or July 2015 and December 2015. While, as noted above, there is a serious legal question as to whether there is a basis on this record for NCA Investors Trust to pursue even that unjust enrichment claim, i.e., the lack of specificity as to why NCA Investors Trust has an entitlement to all of the distributions made to Merritt and Kelly during this limited several month period, the Court will allow this limited unjust enrichment claim to go forward for now and address this narrower issue before or at trial.

Accordingly, because there is a genuine dispute of material fact as to whether Defendants' distributions between June or July 2015 and December 2015 constitute unjust enrichment, the Court will not grant summary judgment on this claim.

Defendants also argue that Plaintiff has unclean hands. Under this defense, a party "must show that his conduct has been fair, equitable and honest as to the particular controversy in issue," and "[u]nless the [party]'s conduct is of such a character as to be condemned and

pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." *Bauer v. Waste Mgmt. of Conn., Inc.*, 239 Conn. 515, 525 (1996) (citation omitted). In cases "[w]here a plaintiff's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief, and will leave him to whatever remedies and defenses at law he may have." *Thompson v. Orcutt*, 257 Conn. 301, 310 (2001) (quoting *Samasko v. Davis*, 135 Conn. 377, 383 (1949)). An unclean hands defense only applies to the particular transaction under consideration and "the conduct alleged to be unclean must have been done directly against the interests of the party seeking to invoke the doctrine, rather than the interests of a third party." *Id.* at 311 (citations omitted).

Alternatively, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party . . . ." *Hottie v. BDO Seidman LLP*, 268 Conn. 694, 719 (2004) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)) (applying New York law). "The doctrine of unconscionability contains both substantive and procedural aspects, and whether a contract or clause is unconscionable is to be decided by the court against the background of the contract's commercial setting, purpose and effect . . . ." *Id.* (quoting *Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 138 (1989)).

Defendants argue that NCA Investors Trust (1) required Defendants to guarantee the Upsize Loan, despite over 10% of it being used to repay an unrelated investment made by UCF's CEO in another non-Seaboard Realty deal with Mr. DiMenna; (2) required Defendants to guarantee the previously loaned $15.5 million; (3) acquired the exclusive right for certain transactions both within and outside of the Seaboard Realty portfolio; (4) never contacted or

attempted to contact the Defendants before the execution of the Upsize Guarantees; (5) violated its own procedures and did not obtain a legal opinion letter with respect to the Upsize Loan and Guarantees; and (6) destroyed Seaboard Realty records, which deprived Defendants of the opportunity to review these records in support of their defenses. Defs.' Mem. at 27-31.

In response, NCA Investors Trust contends that "[i]n lending transactions, unclean hands cannot be asserted where the borrower is a sophisticated commercial party." Pl.'s Opp. at 35. Plaintiff submits that "UCF negotiated in good faith" and "made a business decision not to obtain an additional opinion letter." *Id.* at 36. In addition, NCA Investors Trust argues that Defendants have not met their burden to establish unclean hands, and that material issues of fact remain for trial. *Id.* at 36-37.

In reply, Defendants note that – regardless of whether PSWMA was a sophisticated borrower – UCF did not attempt to contact or negotiate with Defendants, who were unrepresented with respect to the Upsize Guarantees that required their personal guarantees. Defs.' Reply at 6. And the destruction of Seaboard Realty records at the hands of Plaintiff's Trustee prejudices the Defendants here, so "Plaintiff should not be allowed to profit from its own wrongful conduct." *Id.* at 6-8.

The Court disagrees and will not apply the doctrine of unclean hands at this time, as it relates to the underlying transaction at issue between the parties, but it will consider the doctrine's applicability at the time of trial, as it relates to the destruction of documents during the course of discovery.

As the Connecticut Supreme Court stated quite aptly, "the doctrine of unclean hands exists to safeguard the integrity of the court . . ." *Thompson*, 257 Conn. at 310 (citations omitted). The doctrine seeks to prevent parties from benefitting from their own fraud or other

illegal behavior. *See id.* at 312 ("This court has addressed the scope of the doctrine of unclean hands and, as noted previously, if a party's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general deny him any relief . . . ." (citations and quotations omitted)).

Merritt and Kelly raise questions about the business practices of NCA Investors (or its predecessor entity, UCF). For example, Plaintiff seeks to recover under the Upsize Guarantees, which—as previously discussed—had no participation from Defendants. Also, as a condition to the Upsize Guarantees, it is undisputed that NCA Investors Trust required the resignations of Defendants (which was false). *See* Pl.'s SMF ¶ 26 ("DiMenna provided UCF with the forged written consent . . . and the forged resignations of Kelly and Merritt . . . Moreover, UCF was required to consent to any action or attempted action to remove, replace, or substitute DiMenna as the managing member of Seaboard Realty."). Finally, UCF never contacted Defendants about personally guaranteeing loans totaling $18.8 million, and in fact, required their disengagement with the loans. But the only clearly fraudulent or illegal behavior in this record relates to Mr. DiMenna, not NCA Investors Trust, much less Merritt and Kelly. As a result, this Court will not exercise its discretion and apply the doctrine of unclean hands to NCA Investors Trust's remaining claim of unjust enrichment because of UCF's business practices. *See Thompson*, 257 Conn. at 308 ("[A]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court." (citations and quotations omitted)).

Nevertheless, NCA Investors Trust's destruction of over 1,000 boxes worth of Seaboard Realty records is a different matter. *See* Sanctions Order, ECF No. 191 (granting in part and denying in part Defendants' motion to dismiss or for sanctions based on NCA Investors Trust's destruction of discovery records). To the extent that this destruction affects the defense of Merritt

and Kelly to NCA Investors Trust's remaining (albeit limited) unjust enrichment claim, the Court may apply the doctrine of unclean hands accordingly, to the extent appropriate. The decision of this doctrine's applicability in this context, however, will be reserved for trial.

Accordingly, the Court will not dismiss NCA Investors Trust's unjust enrichment claim at this time, although it is limited, and may be subject to the doctrine of unclean hands, as it relates to the destruction of documents.

## IV. CONCLUSION

For the following reasons, Defendants' motion for summary judgment is **GRANTED in part and DENIED in part.**

NCA Investors Trust's breach of contract claims are dismissed, but its unjust enrichment claim will proceed to trial, although this claim will be limited as discussed herein.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of December, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE